

# NUMBER 13-21-00310-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

**KENNETH HAHN,**                                                                                   **Appellant,**

**v.**

**CONOCOPHILLIPS COMPANY,**                                                             **Appellee.**

---

### On appeal from the 267th District Court
### of DeWitt County, Texas.

---

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Tijerina
Memorandum Opinion by Chief Justice Contreras**

This appeal, the second in the underlying trial court cause, concerns the calculation of appellee ConocoPhillips Company's (Conoco) mineral royalty payments to appellant Kenneth Hahn in this oil and gas dispute. The trial court granted summary judgment in favor of Conoco. By two issues, Kenneth contends that the trial court erred

by: (1) concluding that his non-participating royalty interest (NPRI) was reducible by a landowner's royalty contained in an oil and gas lease; and (2) awarding Conoco attorney's fees under the Uniform Declaratory Judgments Act (UDJA). Because we hold that Kenneth's royalty interest was not reducible by the relevant landowner's royalty provision and that the trial court erred by awarding Conoco attorney's fees, we reverse and render in part and remand in part.

## I. OVERVIEW OF RELEVANT TERMINOLOGY

To frame the background facts in this case, the context as to what rights are at issue in this appeal, and our forthcoming discussion, we begin by briefly defining certain oil and gas terminology and the rights associated with a mineral estate.

> An instrument conveying land in fee simple transfers both the surface estate and all minerals and mineral rights, unless the instrument contains a reservation or expresses a contrary intention. *Schlittler v. Smith*, 128 Tex. 628, 101 S.W.2d 543, 544 (1937). The mineral estate is comprised of five severable rights: "1) the right to develop, 2) the right to lease, 3) the right to receive bonus payments, 4) the right to receive delay rentals, and 5) the right to receive royalty payments." *French v. Chevron U.S.A. Inc.*, 896 S.W.2d 795, 797 (Tex. 1995). The holder of the leasing privilege is the executive-interest holder. *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 75 (Tex. 2015). The executive enjoys the exclusive right to make and amend mineral leases and, correspondingly, to negotiate for the payment of bonuses, delay rentals, and royalties, subject to a duty of utmost good faith and fair dealing to non-executive interest holders. *Id.* at 74–75 ([first] citing Lee Jones, Jr., *Non–Participating Royalty*, 26 TEX. L. REV. [569, 575 (1948)], and [then citing] *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789–90 (Tex. 1995)). "In Texas, a typical oil and gas lease actually conveys the mineral estate (less those portions expressly reserved, such as royalty) as a determinable fee," with the possibility of reverter as a future interest. *Luckel* [*v. White*], 819 S.W.2d [459,] 464 [(Tex. 1991)].

> "A royalty interest derives from the grantor's mineral interest and is a nonpossessory interest in minerals that may be separately

2

alienated." *Id.* at 463. "The same instrument may convey an undivided portion of the mineral estate and a separate royalty interest, and the royalty interest conveyed may be larger or smaller than the interest conveyed in the minerals in place." *Id.* A party possessing a royalty interest that does not include the right to lease the mineral estate, receive delay rentals, or bonus payments is referred to as a[n NPRI] holder. *KCM Fin.*, 457 S.W.3d at 75.

*Hysaw v. Dawkins*, 483 S.W.3d 1, 8–9 (Tex. 2016). An NPRI "is non-possessory in that it does not entitle its owner to produce the minerals himself. It merely entitles its owner to a share of the production proceeds, free of the expenses of exploration and production." *Plainsman Trading Co.*, 898 S.W.2d at 789. In basic terms, an NPRI is an expense-free royalty interest in minerals, if such minerals are ever produced.

Royalty interests may be conveyed or reserved "as a fixed fraction of total production" (fractional royalty interest) or "as a fraction of the total royalty interest" (fraction of royalty interest). *Luckel*, 819 S.W.2d at 464. A fractional royalty interest conveys a fixed share of production and "remains constant regardless of the amount of royalty contained in a subsequently negotiated oil and gas lease." *Coghill v. Griffith*, 358 S.W.3d 834, 838 (Tex. App.—Tyler 2012, pet. denied). In comparison, a fraction of royalty interest (as a percentage of production) varies in accordance with the size of the landowner's royalty in a mineral lease and "is calculated by multiplying the fraction in the royalty reservation by the royalty provided in the lease." *Id.*; *see Luckel*, 819 S.W.2d at 464.

*Hysaw*, 483 S.W.3d at 9. A "fraction of royalty" interest is also called a "floating royalty" interest. *Id.* at 4.

## II.  BACKGROUND & PROCEDURAL HISTORY

### A.  The 2002 Partition Deeds

Kenneth and his three siblings, George N. Hahn, Doris Steubing, and Charles Hahn, owned interests in a 74.15-acre tract of land (the Parent Property) in Dewitt County. Kenneth and George owned undivided one-half interests in the Parent

3

Property's surface estate, and each of the four siblings owned undivided one-fourth interests in the property's mineral estate. On August 23, 2002, Kenneth and George executed two partition deeds which provided for exclusive possession of the surface rights to approximately 37.07 acres each; Kenneth would receive the northeast half of the Parent Property's surface estate (Tract A), and George the southwest half (Tract B).

## B. Kenneth Sells Tract A

In September 2002, Kenneth entered into an earnest money contract with William Paul Gips and Lucille Fay Gips for the sale of his interest in Tract A. In December 2002, Kenneth executed the general warranty deed for Tract A to the Gipses, which contained the following reservation:

> SAVE AND EXCEPT and there is hereby reserved unto [Kenneth] herein, his heirs and assigns, an undivided one-half (1/2) non-participating interest in and to all of the royalty [Kenneth] now owns, (same being an undivided one-half (1/2) of [Kenneth's] one-fourth (1/4) or an undivided one-eighth (1/8) royalty) in and to all of the oil royalty, gas royalty and royalty in other minerals in and under and that may be produced from the herein described property. [Kenneth] . . . shall not participate in the making of any oil, gas or mineral lease covering said property, nor shall they participate in any rental or shutin gas well royalty to be paid under any such lease. However, such reservation is subject to reversionary interest to surface owner [fifteen] years from [June 9, 2002] . . . .

The sale excepted three-fourths of the mineral interests under Tract A, which belonged to Kenneth's three siblings.

## C. The Gipses Enter Into an Oil and Gas Lease

In July 2010, the Gipses entered into an oil and gas lease with Conoco (the

4

Conoco/Gips Lease),[1] from which the Gipses reserved a one-fourth landowner's royalty in any minerals produced. Included in the lease was a pooling provision noting that Conoco may, at its discretion, pool Tract A with other surrounding properties. In the event of pooling, Conoco would pay the Gipses a pro rata share of the development based on the total acreage of the pooled unit.

**D.     The 2011 Lease Ratification and Stipulation of Interests**

In July 2011, Kenneth signed a document ratifying the Conoco/Gips Lease. The ratification notes in relevant part:

> WHEREAS, Kenneth Hahn owns a[n] [NPRI] in the oil, gas[,] and other minerals under [Tract A,] the land conveyed by the Lease.
>
> WHEREAS, it is the desire of Kenneth Hahn to adopt, ratify[,] and confirm the Lease.
>
> NOW, THEREFORE, in consideration of the premises and other valuable consideration, the receipt of which is hereby acknowledged, I, Kenneth Hahn, do hereby ADOPT, RATIFY, and CONFIRM the Lease in all of its terms and provisions, and do hereby LEASE, GRANT, DEMISE[,] and LET unto [Conoco], its successors and assigns, subject to and in accordance with all the terms and provisions of the Lease as fully and completely as if I had originally been named as Lessor in the Lease and had executed, acknowledged[,] and delivered the same. And I do hereby agree and declare that the Lease in all of its terms and provisions are binding on me and is a valid and subsisting oil, gas[,] and mineral lease.

On October 1, 2011, Conoco pooled Tract A into what it calls the Maurer Unit B, consisting of a combined 307.41 acres. In November 2011, Conoco requested that Kenneth and the Gipses "stipulate as to their ownership" in Tract A and presented the

---

[1] The Gipses entered into a lease with Burlington Resources Oil & Gas, a Conoco subsidiary. We refer to Burlington and Conoco collectively as Conoco.

5

parties with a stipulation agreement for their signatures. Pursuant to Conoco's request, Kenneth and the Gipses stipulated that "it was the intent of the parties in the deed from [Kenneth] to [the Gipses] . . . that the interest reserved was a one-eighth (1/8) 'of royalty' for a term of [fifteen] years from June 9, 2002."

**E.     Kenneth Enters Into an Oil and Gas Lease of Tract B**

In August 2010, Kenneth entered into an oil and gas lease with Conoco covering his one-fourth mineral interest in Tract B. Conoco also pooled the Tract B lease into Maurer Unit B. In May 2012, Conoco issued a division order to Kenneth pursuant to Conoco's lease of Tract B, which certified the ownership of mineral interests in oil and gas production from Tract B payable by Conoco. At an unspecified later date, Kenneth "was informally advised by Conoco[] that it would no longer be crediting him with his 1/4 mineral interest in Tract B." Kenneth stated that Conoco questioned his mineral interest in Tract B on account of his and George's August 2002 partition deeds. According to Conoco, Kenneth conveyed all of his surface and mineral rights in Tract B to George, and George conveyed all of his surface and mineral rights in Tract A to Kenneth. If that were true, then prior to his sale to the Gipses, Kenneth would have owned the entire surface estate and one-half of the mineral estate in Tract A, and no rights—surface or mineral—in Tract B.

**F.     Kenneth Files Suit**

In March 2015, Kenneth filed suit against the Gipses and Conoco "to confirm his title and ownership of a one-fourth (1/4) mineral interest in and to" Tract B and "a one-eighth (1/8) royalty interest in and to" Tract A, asserting claims of, among other

6

things, trespass to try title and breach of lease agreement.[2] The parties filed several cross- and counter-motions for summary judgment, and the trial court held a hearing on the motions in October 2015. In November 2015, the trial court concluded in relevant part that:

i. The Kenneth Hahn Partition Deed conveyed all of the grantor's interest in the oil, gas[,] and other minerals in and under [Tract B].

ii. The George Hahn Partition Deed conveyed all of the grantor's interests in the oil, gas[,] and minerals in and under [Tract A].

iii. The Gips[es'] Deed [from Kenneth] conveyed all of [Kenneth]'s interest in the oil, gas[,] and minerals in and under [Tract A], only reserving to . . . Kenneth Hahn[] a fraction of royalty and not a fixed fractional royalty and thus entitles Kenneth Hahn and his heirs, successors[,] and assigns a fraction of royalty that floats in accordance with the size of the landowner's royalty contained in any present or future oil and gas lease and is equal to one-eighth (1/8th) of the landowner's royalty contained under present or future leases for a term of [fifteen] years beginning June 9, 2002[.]

Thus, the trial court's order resulted in the following division of interests in the Parent Property:

| Severed Surface & Mineral Estate Post-2015 Summary Judgment | | |
|---|---|---|
| Owner | Interests in the Parent Property | |
| | Tract A | Tract B |
| Doris | 25% mineral interest; 0% surface interest | |
| Charles | 25% mineral interest; 0% surface interest | |
| George | 0% surface or mineral interests | 100% surface & 50% mineral interest |
| Kenneth | 0% surface interest & 1/8 floating royalty interest for fifteen years beginning June 9, 2002 | 0% surface or mineral interest |

---

[2] Kenneth's live pleading, his fifth amended petition, includes claims for: (1) trespass to try title; (2) breach of lease; (3) tortious interference with lease; (4) statutory underpayment of royalties under Chapter 91 of the Texas Natural Resources Code; (5) foreclosure of lease interest; (6) money had and received; and (7) unjust enrichment.

7

| The Gipses | 100% surface interest & 50% mineral interest less Kenneth's 1/8 floating royalty interest for a fifteen-year term beginning June 9, 2002 | 0% surface or mineral interest |
|---|---|---|

## G.    Kenneth's First Appeal to this Court

In 2016, Kenneth appealed the trial court's summary judgment to this Court. *See Hahn v. Gips*, No. 13-16-00336-CV, 2018 WL 771908, at *1 (Tex. App.—Corpus Christi–Edinburg Feb. 8, 2018, pet. denied) (mem. op. on reh'g). In his nine-issue brief, Kenneth argued, among other things, that the trial court erred: (1) in interpreting Kenneth's and George's partition deeds and the interests in Tracts A and B thereby conveyed; (2) by "interpreting the 'Reservations from Conveyance' section of [Kenneth's 2002 deed of Tract A to the Gipses] as reserving a 1/8 floating royalty, rather than a 1/8 fixed royalty"; and (3) by "giving effect to the [faulty] . . . 'Stipulation of Interest'" between Kenneth and the Gipses.

In February 2018, after reviewing the record, we concluded, among other things, that: (1) the trial court erred in ruling that through their partition deeds, "Kenneth and George transferred anything more than the surface estate of Tract A and Tract B to each" other; (2) Kenneth reserved in the Tract A deed to the Gipses a fixed one-eighth royalty for a fifteen-year term; and (3) because Kenneth's deed to the Gipses was unambiguous, the trial court erred by considering the 2011 stipulation of interest. *Id.* at *6–8.[3] Represented visually, we held the parties' interests in the Parent Property were

---

[3] We acknowledge that our 2018 memorandum opinion on rehearing contains an error in the conclusion section regarding the mineral royalty interests Kenneth reserved in his Tract A deed to the

as follows:

| Severed Surface & Mineral Estate Post-2016 Appeal | | |
|---|---|---|
| **Owner** | **Interests in the Parent Property** | |
| | **Tract A** | **Tract B** |
| **Doris** | 25% mineral interest; 0% surface interest | |
| **Charles** | 25% mineral interest; 0% surface interest | |
| **George** | 0% surface interest; 1/4 mineral interest | 100% surface interest & 1/4 mineral interest |
| **Kenneth** | 0% surface interest & 1/8 fixed royalty for fifteen years beginning June 9, 2002 | 0% surface interest & 1/4 mineral interest |
| **The Gipses** | 100% surface interest & 1/4 mineral interest less Kenneth's 1/8 fixed royalty for a fifteen-year term beginning June 9, 2002 | 0% surface or mineral interests |

We remanded the case to the trial court "for any further proceedings consistent with [our] opinion." *Id.* at *9. Conoco appealed our decision to the supreme court, which, after full merits briefing, denied the petition.

## H.     A Royalty Calculation Dispute Arises on Remand

On remand, a dispute arose between Kenneth and Conoco as to the calculation of Kenneth's royalty interest in the pooled Maurer Unit B based on Kenneth's one-eighth fixed NPRI in Tract A.[4] The parties agree that Tract A's tract participation rate

---

Gipses. While Kenneth's interests in Tract A were correctly described in our analysis section, our conclusion erroneously referred to them as applying to the entire Parent Property. *See Hahn v. Gips*, No. 13-16-00336-CV, 2018 WL 771908, at *9 (Tex. App.—Corpus Christi–Edinburg Feb. 8, 2018, pet. denied) (mem. op. on reh'g). The parties both recognize and agree, however, that the reservation applied only to Tract A.

[4] All issues related to the calculation of Kenneth's royalty payments from Tract B were resolved in the trial court and are not before this Court. Additionally, in August 2021, the Gipses and Kenneth each nonsuited their claims against one another pursuant to a settlement agreement. Thus, this appeal only concerns Kenneth's and Conoco's claims against each other.

in Maurer Unit B is 0.12058814, representing 37.07 acres (Tract A) divided by 307.41 acres (Maurer Unit B). That is, about twelve percent of Maurer Unit B's production was deemed attributable to Tract A. According to Kenneth, his royalty interest was to be calculated by multiplying his one-eighth interest in Tract A by Tract A's 0.12058814 pooled decimal participation rate for a mineral royalty interest decimal of 0.01507352. For example, then, if Maurer Unit B produced $1 million in proceeds, he was due a royalty payment of $15,073.52.

Conoco disagreed and moved for a declaratory judgment counterclaim in March 2020, claiming for the first time that Kenneth's July 2011 ratification of the Conoco/Gips Lease meant that he was bound to all the lease's terms. Because the Gipses leased Tract A to Conoco for a one-fourth landowner's royalty, Conoco argued that Kenneth's royalty should be subject to and diminishable by the Gipses' one-fourth landowner's royalty. Stated another way, Conoco argued that notwithstanding this Court's 2018 conclusion that Kenneth reserved a fixed one-eighth NPRI in Tract A, Kenneth's ratification of the Conoco/Gips Lease transformed his fixed NPRI into a floating one. Consequently, according to Conoco, instead of receiving royalties based on one-eighth of Tract A's 0.12058814 pooled participation rate, Kenneth was to receive one-eighth of one-fourth of the royalties based on that rate—represented graphically by the parties as follows:

| Kenneth's Interest | x | Gips Lease Royalty | x | Tract Participation Factor | = | Royalty Decimal |
|---|---|---|---|---|---|---|
| 1/8 | x | 1/4 | x | 0.12058814 | = | .00376838 |

10

Presenting the same example based on that calculation, if Maurer Unit B produced $1 million in proceeds, Kenneth would be due a check for $3,768.38.

Conoco argued in its subsequent motion for summary judgment that the plain language of Kenneth's 2011 ratification of the Conoco/Gips Lease was unambiguous and that Kenneth could not partially ratify the lease—i.e., he could not accept the pooling provision while sidestepping the lease's one-fourth landowner's royalty provision.

Kenneth generally denied Conoco's counterclaim and asserted affirmative defenses. Pointing to this Court's disposition in his 2016 appeal, Kenneth argued in his subsequent motion for summary judgment that Conoco's calculation was erroneous because, as an owner of a fixed one-eighth NPRI in Tract A, his interest was definitionally not diminishable by the landowner's royalty, and he was thus being paid one-fourth of the royalties that he was due. Kenneth also argued that his 2011 ratification of the Conoco/Gips Lease "does not (and does not purport to) transform Kenneth's fixed royalty into a floating one," and in any event, Conoco's "untimely attempt to assert ratification . . . is barred by estoppel, waiver, . . . laches," and the law-of-the-case doctrine.

The trial court considered the cross-motions for summary judgment and, in its June 15, 2020 order, held that: (1) Kenneth "ratified [the Conoco/Gips Lease] and is therefore bound by all terms in that . . . Lease"; (2) "based on that ratification, the royalty decimal that should have been used to calculate Kenneth['s] . . . royalty interest in Tract A . . . was 0.00376838"; and (3) Conoco "shall recover its reasonable and

11

necessary attorney's fees for pursuing [its] declaratory judgment claim."

This appeal by Kenneth followed.

### III.    STANDARD OF REVIEW

Our review of a summary judgment is de novo. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021). To be entitled to a traditional summary judgment, a movant must establish there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Painter v. Amerimex Drilling I, Ltd.*, 561 S.W.3d 125, 130 (Tex. 2018). When both parties move for summary judgment on the same issues and the trial court grants one motion and denies the other, we consider the summary judgment evidence presented by both sides, determine all questions presented, and render the judgment the trial court should have rendered. *Tarr v. Timberwood Park Owners Ass'n*, 556 S.W.3d 274, 278 (Tex. 2018).

### IV.    LAW-OF-THE-CASE DOCTRINE

Because it is potentially dispositive, we first address whether the law-of-the-case doctrine fully resolves this appeal.

### A.    Applicable law

The law-of-the-case doctrine refers to the principle under which questions of law decided on appeal to the court of last resort will govern the case throughout its subsequent stages. *Hudson v. Wakefield*, 711 S.W.2d 628, 630 (Tex. 1986). "By narrowing the issues in successive stages of the litigation, the law of the case doctrine is intended to achieve uniformity of decision as well as judicial economy and efficiency."

12

*Id.* "[T]he doctrine does not necessarily apply when either the issues or the facts presented at successive appeals are not substantially the same as those involved on the first trial." *Id.* Accordingly, "when in the second trial or proceeding, one or both of the parties amend their pleadings, it may be that the issues or facts have sufficiently changed so that the law of the case no longer applies." *Id.*

Application of the law-of-the-case doctrine lies within the discretion of the court, depending on the particular circumstances of the case. *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003). The law-of-the-case doctrine does not necessarily prevent a court from reconsidering its earlier decision if an intervening supreme court decision effects a change in the controlling law. *See City of Dallas v. Jones*, 331 S.W.3d 781, 784 (Tex. App.—Dallas 2010, pet. dism'd); *McCrea v. Cubilla Condo. Corp., N.V.*, 769 S.W.2d 261, 263 (Tex. App.—Houston [1st Dist.] 1988, writ denied).

**B.    Analysis**

Kenneth argues that this Court's conclusion in his 2016 appeal that he reserved a fixed one-eighth NPRI in Tract A resolves the question in this appeal. Conoco argues that the law-of-the-case doctrine does not apply in that manner because (1) the issue in this appeal is different from the issue in Kenneth's 2016 appeal and (2) intervening supreme court case law calls for our reconsideration of our prior holding.

As noted, Kenneth's initial appeal concerned what rights, if any, he maintained after (1) his and George's 2002 partition deeds and (2) his 2002 deed of Tract A to the Gipses. *See Hahn*, 2018 WL 771908, at *1. On remand, Kenneth amended his petition, and Conoco raised Kenneth's 2011 ratification of the Conoco/Gips Lease in arguing

13

for a lower royalty decimal rate. The issue of ratification was never argued to this Court in Kenneth's 2016 appeal. *Id.*; *see Hudson*, 711 S.W.2d at 630.

One of the issues that was presented in the 2016 appeal was whether, through his 2002 deed to the Gipses, Kenneth reserved a fixed or floating NPRI in Tract A. *See Hahn*, 2018 WL 771908, at *1. We held that Kenneth reserved a fixed one-eighth NPRI, and the supreme court denied Conoco's subsequent petition for review in which the issue was fully briefed. Accordingly, all else being equal, the law-of-the-case doctrine dictates that determination will continue to govern in this case. *See Hudson*, 711 S.W.2d at 630. But, as discussed below, the fact that Kenneth maintained a fixed NPRI is highly relevant to, but not itself dispositive of, the issue of whether Kenneth's 2011 ratification of the Conoco/Gips Lease affected his royalty interest under Tract A. Simply stating that Kenneth has a fixed NPRI under the deeds does not answer whether Kenneth later agreed to nonetheless receive royalties at a lower rate. Accordingly, we agree with Conoco insofar as it argues that our conclusion in Kenneth's 2016 appeal does not resolve the issue in this appeal.

However, we disagree with Conoco's contention that intervening supreme court case law requires us to reconsider our holding that Kenneth maintains a fixed, rather than floating, one-eighth NPRI in Tract A. Conoco directs us to the supreme court's decision in *Concho Resources, Inc. v. Ellison*, 627 S.W.3d 226 (Tex. 2021), to argue that this Court erred by failing to give effect to Kenneth's 2011 stipulation of interest. By adding the word "of" in the phrase "of royalty," the stipulation's language potentially indicates that through his 2002 deed to the Gipses, Kenneth reserved a floating

14

royalty.[5] We never addressed or analyzed that issue as, in Kenneth's 2016 appeal, we held that the trial court improperly considered the stipulation in concluding that Kenneth's interest was a floating one:

> We further conclude that in construing [Kenneth and] the Gips[es' 2002] deed, the trial court improperly considered the 2011 Stipulation because it violated the four corners rule. As stated throughout this opinion, we construe an unambiguous deed by examining only what is stated within the four corners of the instrument. *See Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). The trial court concluded that [Kenneth and] the Gips[es' 2002] deed was unambiguous, and so do we.
>
> Thus, the trial court erred in considering the stipulation because it was outside of the four corners of [Kenneth and] the Gips[es' 2002] deed and immaterial in construing the unambiguous deed. *See id.*; *see also Sun Oil Co. (Del.) v. Madeley*, 626 S.W.2d 726, 732 (Tex. 1981) (holding that only when a contract is first found to be ambiguous may the courts consider the parties' interpretation and where the meaning of a contract is plain and unambiguous, a party's construction is immaterial); *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979) (holding that "great, if not controlling, weight should be given by the court to the interpretation by the parties themselves when a contract has uncertain meaning only["]). Our conclusion today does not hold that stipulations or party's interpretation may never be utilized in construing a deed. However, because the deed in this case is unambiguous and without uncertain meaning, we need not look outside the four corners here. Accordingly, we sustain Kenneth's sixth issue.

*Hahn*, 2018 WL 771908, at *8 n.5.

In *Concho Resources, Inc.*, the supreme court considered the effect of a boundary agreement executed by owners of adjacent property. 627 S.W.3d at 226. Between 1927 and 2008, the relevant tracts were conveyed multiple times, and the

---

[5] *See Hysaw v. Dawkins*, 483 S.W.3d 1, 9 (Tex. 2016) (noting difference between a "fractional" and "fraction of" royalty); *see also* Christopher Kulander, *Fixed vs. Floating Non-Participating Oil & Gas Royalty in Texas: And the Battles Rage On . . .*, 4 Tex. A&M L. Rev. 41, 44–46 (2016) (collecting and comparing examples of deeds reserving fixed and floating royalties and noting relevance of the word "of").

acreage and location of the tracts were described differently in various deeds and leases. *Id.* at 229. An oil operator, Samson, desired to drill a well on one of the properties but discovered the conflicting boundary descriptions. *Id.* at 230. Samson prepared a boundary stipulation noting that "a question has arisen among the [p]arties as to the physical location" of the boundary between the two properties. *Id.* The stipulation described the boundary in a way contrary to the original deed. *Id.* Both mineral estate owners signed the stipulation, and various lessees, including Jamie Ellison, purported to ratify the agreement. *Id.* Samson then drilled wells. *Id.* at 230–31.

Jamie Ellison died in 2011. *Id.* at 231. In 2013, his wife, Marsha, filed suit against Samson, alleging that her lease covers more acreage than that to which the mineral owners stipulated. *Id.* The trial court granted summary judgment against Ellison. *Id.* at 232–33. This Court reversed, holding, *inter alia*, that the boundary agreement was "close in nature to a 'correction deed' in which a party seeks to retroactively 'correct the defects and imperfections' of the original deed." *Ellison v. Three Rivers Acquisition LLC*, 609 S.W.3d 549, 561 (Tex. App.—Corpus Christi–Edinburg 2019), *rev'd sub nom. Concho Res., Inc.*, 627 S.W.3d at 226. But to correct the deed, "the underlying deed must still possess some 'ambiguity or error' to correct." *Id.* We concluded that because "the 1927 Deed was unambiguous and that there was no uncertainty regarding the boundary between the [relevant two tracts,] . . . the 2008 Boundary Stipulation agreement was invalid and void." *Id.* at 562.

The supreme court reversed our decision, holding that the boundary stipulation was enforceable between the parties, and that Ellison ratified the agreement. *Concho*

16

*Res., Inc.*, 627 S.W.3d at 234. The court concluded that when a question arises concerning a boundary location, parties may resolve the dispute by going to court or by signing a boundary agreement. *Id.* It matters not whether an original deed is unambiguous; if there is doubt in the minds of the parties as to a boundary, they may settle the matter by agreement, even if it is later determined that the issue was erroneously settled. *Id.* at 234, 235 n.12.

The instant case is distinguishable in at least two respects. First, unlike *Concho* and the cases cited therein, this case does not concern a boundary dispute. *See id.*; *Gulf Oil Corp. v. Marathon Oil Co.*, 152 S.W.2d 711, 714 (Tex. 1941); *Levy v. Maddux*, 16 S.W. 877, 878 (Tex. 1891); *Houston Oil Co. of Tex. v. Singleton*, 44 S.W.2d 479, 481 (Tex. App.—Beaumont 1931). *Concho* has yet to be extended to property issues outside the boundary dispute context, and we do not take the liberty to do so here. Second, in *Concho*, multiple conveyances and leases with conflicting boundary descriptions evidently led to ambiguity in the minds of the parties as to the correct boundary separating the properties, demonstrated by, among other things, the boundary stipulation's statement that a "question has arisen" as to the proper boundary. In this case, there is no evidence in the 2011 stipulation of interest or elsewhere that a "question arose" between the parties as to the interest that Kenneth reserved by his 2002 deed of Tract A to the Gipses.

Accordingly, because the issue of the 2011 stipulation has been argued to and rejected by the supreme court in this very case, and because the supreme court's holding in *Concho* does not bear on our conclusion in Kenneth's 2016 appeal, we follow

17

our prior conclusion that Kenneth maintained a fixed one-eighth NPRI in Tract A through June 8, 2017. We proceed to analyze whether Kenneth's ratification of the Conoco/Gips Lease affected that interest.

## V.  RATIFICATION

It is undisputed that Kenneth ratified the Conoco/Gips Lease in its entirety. The principal question before this Court is whether Kenneth, by doing so, transformed his fixed one-eighth NPRI in Tract A into a floating NPRI subject to the Gipses' one-fourth landowner's royalty listed in the lease. Kenneth argues that: (1) a fixed mineral interest is definitionally not diminishable by a landowner's royalty; (2) he could not be bound to the landowner's royalty clause because the Conoco/Gips Lease was not entered into on his behalf; (3) the Gipses did not and could not lease his NPRI on his behalf; and (4) the effect of his ratification was to agree to the lease's pooling provision alone. Conoco argues that Kenneth cannot "accept the benefits of ratifying the lease to obtain the benefit of pooling, without also accepting the burdens of ratification such as being bound by the lease's royalty clause." Conoco states that Kenneth "cites no Texas authority that has adopted [a] theory allowing for ratification for pooling purposes only." As discussed below, we disagree with Conoco's contentions. We further note that Conoco cites no authority, and we have found none, where a fixed NPRI was converted into a floating one in any circumstance.

## A.  Applicable Law

### 1.  General Principles of Ratification

"Ratification is the adoption or confirmation by a person with knowledge of all

18

material facts of a prior act which did not then legally bind him and which he had the right to repudiate." *BPX Operating Co. v. Strickhausen*, 629 S.W.3d 189, 196 (Tex. 2021) (quoting *Wise v. Pena*, 552 S.W.2d 196, 199 (Tex. App.—Corpus Christi–Edinburg 1977, writ dism'd)). Ratification "is but an agreement, express or implied, by one to be bound by the act of another performed for him." *Id.* (quoting *Dillingham v. Anthony*, 11 S.W. 139, 142 (Tex. 1889)); *see Enserch Corp. v. Rebich*, 925 S.W.2d 75, 84 (Tex. App.—Tyler 1996, writ dism'd by agr.) ("[R]atification is reserved for the adoption of acts *done only on behalf of the alleged ratifier*."); *Rhodes, Inc. v. Duncan*, 623 S.W.2d 741, 744 (Tex. App.—Houston [1st Dist.] 1981, no writ) ("There can be no ratification of an act which is not done in behalf of, and does not purport to bind, the person against whom the doctrine of ratification is invoked."). "A principal may not, in equity, ratify those parts of the transaction which are beneficial and disavow those which are detrimental. Ratification extends to the entire transaction." *Land Title Co. of Dall. v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 757 (Tex. 1980); *see BPX Operating Co.*, 629 S.W.3d at 196; *Plains Cotton Co-op. Ass'n v. Wolf*, 553 S.W.2d 800, 804 (Tex. Civ. App.—Amarillo 1977, writ ref'd n.r.e.) ("In equity, the conduct of one's agent must be either repudiated or ratified in toto."). "Ratification is often treated as a mixed question of law and fact. When the facts are uncontroverted, however, the court may decide the question of ratification as a matter of law." *BPX Operating Co.*, 629 S.W.3d at 196 (internal citations omitted).

### 2. Ratification in the Oil and Gas Pooling Context

As noted, a mineral estate consists of five severable rights, namely the rights

to: (1) develop; (2) lease; (3) receive bonus payments; (4) receive delay rentals; and (5) receive royalty payments. *Hysaw*, 483 S.W.3d at 9 (citing *French*, 896 S.W.2d at 797). "A conveyance of a mineral estate need not dispose of all interests; individual interests can be held back, or reserved, in the grantor." *French*, 896 S.W.2d at 797. "Thus, each attribute is a separate, distinct property interest that may be conveyed or reserved in connection with a conveyance of a mineral interest." *Hamilton v. Morris Res., Ltd.*, 225 S.W.3d 336, 344 (Tex. App.—San Antonio 2007, pet. denied).

The holder of the leasing right is known as the executive interest holder. *KCM Fin. LLC*, 457 S.W.3d at 75. "The executive enjoys the exclusive right to make and amend mineral leases and, correspondingly, to negotiate for the payment of bonuses, delay rentals, and royalties, subject to a duty of utmost good faith and fair dealing to non-executive interest holders." *Hysaw*, 483 S.W.3d at 9. In other words, "the executive has the power to make and amend leases affecting the enjoyment of the non-executive's interests." *KCM Fin. LLC*, 457 S.W.3d at 75. A caveat exists in the context of pooling.

In certain instances, a tract of land chosen for oil exploration or development may be "of insufficient size to satisfy the state's spacing or density requirements." *Browning Oil Co., Inc. v. Luecke*, 38 S.W.3d 625, 634 (Tex. App.—Austin 2000, pet. denied). "Pooling entails the joinder of various tracts of land sufficient for the issuance of a permit to drill a well in accordance with applicable spacing rules." *MCZ, Inc. v. Triolo*, 708 S.W.2d 49, 52 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). "The primary legal consequence of pooling is that production and operations anywhere on

the pooled unit are treated as if they have taken place on each tract within the unit." *Samson Expl., LLC v. T.S. Reed Props., Inc.*, 521 S.W.3d 766, 774–75 (Tex. 2017) (quoting *Pipe Line Co. v. Tichacek*, 997 S.W.2d 166, 170 (Tex. 1999)).

Texas has adopted the view "that pooling effects a cross-conveyance among the owners of minerals under the various tracts of royalty or minerals in a pool so that they all own undivided interests under the unitized tract in the proportion their contribution bears to the unitized tract." *Montgomery v. Rittersbacher*, 424 S.W.2d 210, 213 (Tex. 1968). Because pooling affects royalty interests, an executive lacks the power to bind an NPRI to a pooling provision absent the NPRI owner's consent. *Id.*; *see Samson Expl., LLC*, 521 S.W.3d at 775. Consent may be given by, among other things, signing a pooling agreement or ratifying an oil and gas lease containing a pooling provision. *See Samson Expl., LLC*, 521 S.W.3d at 775; *Montgomery*, 424 S.W.2d at 215; *MCZ, Inc.*, 708 S.W.2d at 53.

Generally, "[r]atification of an oil and gas lease by [NPRI owners] is only necessary to effect a pooling of production, and such ratification has been construed as an offer made by the lessor, and accepted by the royalty owners to apportion all proceeds from the lease." *Verble v. Coffman*, 680 S.W.2d 69, 70 (Tex. App.—Austin 1984, no writ); *see London v. Merriman*, 756 S.W.2d 736, 739 (Tex. App.—Corpus Christi–Edinburg 1988, writ denied) ("Absent consent, the executive does not have the legal right to authorize the lessee to pool the royalty rights of the [NPRI] owner with other royalty interest owners. A lease which purports to do so is essentially an offer by the lessor to the other royalty interest owners to create a community lease by ratifying

21

the lease; if they do ratify it, the lease effects a cross-conveyance of interests and a pooling or combining of royalty interests.") (internal citations omitted). If an NPRI owner refuses to consent to pooling, as is its right, "an NPRI must be paid on a nonpooled basis while pooled interests share pro rata." *Samson Expl., LLC*, 521 S.W.3d at 775. "Thus a lessee may owe different royalty obligations with respect to the same lands." *Id.*

## B.     Analysis

As an NPRI owner, Kenneth had no executive rights and thus no ability to enter into a lease with Conoco. *See Plainsman Trading Co.*, 898 S.W.2d at 789. Kenneth's only interest in the Conoco/Gips Lease is his fixed one-eighth NPRI. Consequently, absent a provision in the lease purporting to affect Kenneth's interest, there was no reason for Conoco to seek Kenneth's ratification of the lease. *Montgomery*, 424 S.W.2d at 211–12; *Verble*, 680 S.W.2d at 70. But the lease does include a pooling provision, and, as noted, pooling effects a cross-conveyance of mineral and royalty interests. *Montgomery*, 424 S.W.2d at 213. By entering into a lease containing a pooling provision with Conoco, the Gipses extended an offer to the royalty interest owners in Tract A to pool their interests. *See Verble*, 680 S.W.2d at 70; *London*, 756 S.W.2d at 739. Kenneth ratified the lease and, by doing so, agreed to have his fixed one-eighth NPRI subject to Tract A's tract participation rate in Maurer Unit B—and nothing more.

The case law of ratification in the pooling context guides that determination. In *Ruiz v. Martin*, for example, appellees owned a one-half NPRI in a 463.8-acre tract, which the parties called Tract I. 559 S.W.2d 839, 840–41 (Tex. App.—San Antonio

1977, writ ref'd n.r.e.). Appellant owned three tracts—Tracts I–III—totaling 600 acres. *Id.* at 840. Appellant entered into an oil and gas lease covering the full 600 acres. *Id.* at 841. The lease contained, among other things, a one-eighth landowner's royalty clause and a pooling clause. *Id.* Appellees ratified the lease "to the same extent as if they had originally joined in the execution thereof." *Id.* A gas well was subsequently established on Tract II. *Id.* at 840. "Appellant asserted that he was entitled to all of the royalties from gas produced from such well, and appellees asserted that they had an interest in such royalties." *Id.* The gas company brought suit "seeking a determination of the ownership of the royalties accruing" from the gas well. *Id.* The trial court held that appellees were entitled to a decimal royalty rate of 0.3865, representing their one-half NPRI in Tract I multiplied by Tract I's tract participation factor in the pooled unit (463.8 acres divided by 600 acres). *Id.* In other words, appellees were due their full one-half NPRI diminished only by the tract participation factor, even though no production was occurring on Tract I. The court of appeals affirmed. *Id.* at 844. By ratifying the oil and gas lease "to the same extent as if they had originally joined in the execution thereof," appellees were entitled to pooled royalties but were not thereby bound by the one-eighth landowner's royalty provision—a provision that did not purport to affect their interest. *See id.*; *see also Montgomery*, 424 S.W.2d at 215 ("[W]e hold that the [NPRI] owner has the option to ratify or repudiate a lease containing provisions which as to his interest the holder of the executive rights had no authority to insert in the lease."); *Brown v. Smith*, 174 S.W.2d 43, 46 (Tex. 1943) ("Had Mrs. Lee, the owner of the outstanding royalty interest in the 20-acre tract, joined in the execution of the oil

23

and gas lease, she would have become a party to the pooling agreement contained in the lease."); *Verble*, 680 S.W.2d at 70 (ratification of an oil and gas lease "is only necessary to effect a pooling of production, and such ratification has been construed as an offer made by the lessor, and accepted by the royalty owners to apportion all proceeds from the lease"); *London*, 756 S.W.2d at 739 ("Absent consent, the executive does not have the legal right to authorize the lessee to pool the royalty rights of the [NPRI] owner with other royalty interest owners. A lease which purports to do so is essentially an offer by the lessor to the other royalty interest owners to create a community lease by ratifying the lease.").

Nevertheless, Conoco argues that Kenneth may not ratify its lease with the Gipses for pooling purposes only. Conoco cites six cases for the proposition that "a[n] [NPRI] owner must either ratify the entire transaction or agreement, or none of it." Only two of the cited cases arise in the context of NPRIs: (1) *Montgomery v. Rittersbacher*, cited above; and (2) *Hawkins v. Texas Oil & Gas Corp.*, 724 S.W.2d 878, 890 (Tex. App.—Waco 1987, writ ref'd n.r.e.). And the facts in both cases are distinguishable from the facts here.

In *Montgomery*, Montgomery was the owner of a one-half *floating* NPRI in an eighty-acre tract of land, which the parties called "First Tract." 424 S.W.2d at 211. Rittersbacher maintained the executive interests in First Tract and a contiguous property called "Second Tract." *Id.* Montgomery held no interests in Second Tract. *Id.* Rittersbacher entered into an oil and gas lease with Sun Oil Company (Sun) covering both tracts. *Id.* The lease contained a pooling provision as well as an entirety clause,

24

which provided that:

> If the leased premises are now or shall hereafter be owned in severalty or in separate tracts, the premises, nevertheless, shall be developed and operated as one lease, and all royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage.

*Id.* at 212.

Sun "formed several units out of the original leased acreage." *Id.* Part of Second Tract was pooled with a unit called "Crutchfield Tract," in which neither Montgomery nor Rittersbacher owned interests. *Id.* Sun drilled a well on Crutchfield Tract from which commercial oil production began. *Id.* Montgomery brought suit to collect royalties from Crutchfield Tract by virtue of the entirety clause within Sun and Rittersbacher's lease, which Montgomery claimed to have ratified. *Id.* Both First Tract and Second Tract were subject to the oil and gas lease. According to Montgomery, since Second Tract was pooled with Crutchfield Tract, the owner of Second Tract was to receive royalties from production on Crutchfield Tract. And since, per the lease's entirety clause, royalty is to "be treated as an entirety" and paid to the separate owners in proportion to their acreage, Montgomery sought "the proportion of the royalties accruing under the lease that his [NPRI] bears to the leased acreage." *Id.* The trial court and this Court held for Rittersbacher. *Id.* at 211. Montgomery appealed to the supreme court, which reversed in his favor. *Id.*

The supreme court reiterated that it has held that "pooling effects a cross-conveyance among the owners of minerals under the various tracts of royalty or minerals in a pool so that they all own undivided interests under the [pooled] tract" on

25

a pro rata basis. *Id.* at 213. It noted, therefore, that the executive may only bind the NPRI owner to a pooling provision with the NPRI owner's consent. *Id.* The supreme court saw "no distinction between" a pooling clause and the relevant entirety clause, insofar as they both had the effect of changing the aggregate ownership of an NPRI owner's interest. *Id.* Accordingly, it held "that the [NPRI] owner has the option to ratify or repudiate a lease containing provisions which as to his interest the holder of the executive rights had no authority to insert in the lease." *Id.* at 215.

The court concluded that Montgomery fully ratified Sun and Rittersbacher's lease by suing to collect royalties under the lease, and so he was bound by the terms therein affecting his interests. *Id.* at 214–15. Having ratified the lease, Montgomery was "as much bound thereby as if he had joined in the original execution thereof. As long as the lease is in force, [Montgomery was] not free to claim his full 1/2 [NPRI] under 'First Tract.'" *Id.* at 215. In other words, having ratified the pooling and entirety provisions, Montgomery could not claim his full one-half interest in First Tract, as he agreed to royalties from First Tract, Second Tract, and Crutchfield Tract on a pooled basis using a tract participation percentage.

Conoco points to *Montgomery*'s "not free to claim his full 1/2 [NPRI]" language to support its proposition that "if the [NPRI] owner ratifies the lease to allow pooling, he is bound for all purposes, including by the [landowner's] royalty provision." But that is unsupported by *Montgomery* for two reasons. First, as just noted, the quoted passage of *Montgomery* merely stands for the rule that when an NPRI owner agrees to royalties on a pooled basis, it cannot then demand royalty payments unaffected by the pooled

26

tract participation factor. Second, *Montgomery* deals with pooling and entirety provisions in a lease that affect an NPRI owner's royalty interest. *Id.* at 213 (holding that pooling clauses and the relevant entirety clause affect an NPRI owner's aggregate ownership). It does not, as Conoco suggests, have any bearing on a landowner's royalty provision, which does not affect Kenneth's interest as a fixed NPRI owner. *See Hysaw*, 483 S.W.3d at 9 (noting that a fixed NPRI "remains constant regardless of the amount of royalty contained in a subsequently negotiated oil and gas lease").

Notably, the supreme court in *Montgomery* stated that "[h]ad [Rittersbacher and Sun] not intended to include Montgomery's [NPRI] within the provisions of the entirety clause, they could have easily taken affirmative steps to exclude the interest from the operations of the clause." *Id.* Ostensibly, such a provision would include language specifically excluding NPRI owners from "mak[ing] an entirety clause [or a pooling clause] operative on [the NPRI owner's] interests." *Id.* at 214. Likewise, had Conoco and the Gipses intended for their lease to diminish or inflate Kenneth's interests as a fixed NPRI owner outside the pooling context, they could have included explicit provisions to that end in their lease which Kenneth would then choose whether to fully ratify. But no such provision exists.

*Hawkins* involved the "interpretation of a 1930 deed which conveyed oil and gas interests under 54.2 acres 'subject to' a Humble oil and gas lease that ha[d] since expired." 724 S.W.2d at 880. The deed's granting clause conveyed to W.S. York and Max Scharff a fixed *royalty* interest in the subject property, and the future-lease clause conveyed to each party a one-fourth *mineral* interest following the termination of the

27

Humble lease. *Id.* at 882–83. The chief issue presented was whether, at the expiration of the Humble lease, "the grantees owned a royalty interest or a mineral interest." *Id.* at 880.

Marjorie Hawkins and Phillip Baker were the successors to Scharff's interests under the deed, and John and Kathryn Alford were the successors to York's interests. The Alfords entered a lease with Texas Oil and Gas Corporation (Texas Oil), purportedly leasing all of the relevant tract's mineral estate for a one-eighth landowner's royalty (the Alford Lease). *Id.* at 881. But Hawkins and Baker "refused to accept royalty payments under th[e Alford L]ease or to ratify it because they claimed ownership of a 1/4 mineral interest" under the 1930 deed. *Id.* Instead, after the dispute over their one-fourth interest arose, they entered into their own lease with Texas Oil, leasing their purported one-fourth mineral interest for a one-sixth landowner's royalty. *Id.* Texas Oil pooled both leases into the Williford Gas Unit, and two producing oil wells were drilled within the Williford Gas Unit. *Id.* Texas Oil withheld royalty payments to Hawkins and Baker pending resolution of the dispute over their alleged one-fourth mineral interest. *Id.*

Hawkins and Baker filed a declaratory judgment action against the Alfords and Texas Oil to clarify what interests each party acquired and to recover royalty payments under their lease. *Id.* at 880. Hawkins and Baker "claimed that the [1930] deed's granting clause conveyed a royalty interest, which terminated upon the expiration of Humble's lease, followed by a grant . . . in the future-lease clause of a 1/4 mineral interest." *Id.* Hawkins and Baker also signed affidavits attempting to ratify only the

28

pooling provision within the Alford Lease. The Alfords and Texas Oil contended that a conflict existed between the 1930 deed's granting clause and future-lease clause and that supreme court precedent dictated that, in such instances, the granting clause must prevail. *Id.* at 880–81. Accordingly, the Alfords contended that they owned all of the minerals under the 54.2 acre-tract, burdened only by the fixed royalty interest conveyed in the granting clause. *Id.* at 881.

The trial court concluded in relevant part that: (1) Hawkins and Baker owned a fixed royalty interest under the deed and not a one-fourth mineral interest; and (2) neither Hawkins nor Baker were entitled to royalties from the Alford Lease because they did not ratify the lease. *Id.* at 881–82. The court of appeals affirmed on all grounds. In their unsuccessful appeal, Hawkins and Baker again argued, among other things, that they ratified the pooling of their royalty interests under the Alford Lease and were, therefore, entitled to such royalties. *Id.* at 881. The court of appeals overruled that argument, noting that:

> [Hawkins and Baker] attempted through affidavits to ratify one provision of the [Alford L]ease, the pooling provision, while repudiating the royalty provision and contesting the ownership of the mineral estate covered by the lease. Therefore, Hawkins and Baker cannot now claim the benefits of the [Alford L]ease which they have consistently repudiated and refused to ratify in its entirety.

*Id.*

Conoco presents the immediately preceding quoted language in *Hawkins* to support its proposition that Kenneth may not ratify the pooling provision of its lease with the Gipses while repudiating the "royalty provision." But the facts in *Hawkins* are distinguishable. In the first place, unlike in *Hawkins*, only one lease is at issue in this

29

case. Further, by "repudiating the royalty provision," the court in *Hawkins* was referring to Hawkins and Baker's contention that they were owed a one-sixth landowner's royalty from their lease rather than a fixed royalty interest from the Alford Lease. By "contesting the mineral estate covered by the lease," the court in *Hawkins* was referring to Hawkins and Baker's contention that, through the 1930 deed, they were conveyed a combined one-fourth mineral interest in the 54.2-acre tract. It was the existence of two leases, two theories of deeded mineral interests, and an attempted partial ratification of the Alford Lease at issue in *Hawkins*. No such disputes exist in the instant case. Here, it is undisputed that Kenneth ratified the Conoco/Gips Lease in its entirety, and that the landowner's royalty rate due to the Gipses is one-fourth. And unlike in *Hawkins*, Kenneth is not claiming entitlement to a landowner's royalty at all, or one in excess of the Gipses'. As Kenneth highlights, the most relevant holding in *Hawkins* may be its reiteration that a fixed NPRI is not diminishable by a landowner's royalty. *See id.* at 889. Conoco provides no other relevant authority which would lead this Court to stray from the general rule that by ratifying a typical oil and gas lease, an NPRI owner merely agrees to have its interests pooled per the lease's pooling provision.

By its citation to general ratification principles, Conoco apparently argues that ratification of a pooling provision can only benefit an NPRI owner. *See Land Title Co. of Dall.*, 609 S.W.2d at 757 ("A principal may not, in equity, ratify those parts of the transaction which are beneficial and disavow those which are detrimental"). But by agreeing to have its interest pooled, an NPRI owner generally accepts both the benefits and the burdens of pooling. An NPRI owner benefits from an off-tract well by

30

entitlement to royalties it would otherwise not obtain. An NPRI owner's interests are burdened, however, when a well is drilled on its tract, as the NPRI owner must share the royalties on a pooled basis that it would otherwise enjoy at its full value. *See Mengden v. Peninsula Prod. Co.*, 544 S.W.2d 643, 648 (Tex. 1976) ("When a unit is properly pooled, the owners of the minerals or reversionary interests in a separate tract within the unit surrender their right to receive their interest in all production from wells located on their own tract, and in turn they receive the right to share proportionately from wells on the other included tract."). While some courts in Texas have allowed NPRI owners to selectively ratify pooling arrangements of benefit, *see, e.g.*, *MCZ, Inc.*, 708 S.W.2d at 54–55, in this case, Kenneth ratified the pooling provision before any well was drilled within the pooled Maurer Unit B. In other words, Kenneth had no knowledge as to whether production would occur on Tract A or on other tracts in the pooled unit. Kenneth thus accepted both the benefits and the burdens of the pooling clause—the only provision in the Conoco/Gips Lease that purports to affect his interests.

Finally, not only is Conoco's argument that Kenneth cannot simply ratify the pooling provision in its lease contrary to the case law on point, but it is also not sufficiently developed. For instance, Conoco argues that Kenneth cannot selectively ratify its lease with the Gipses, but then only argues that Kenneth should be bound to the lease's pooling and landowner's royalty provisions. However, under Conoco's rationale that Kenneth should be bound to all terms in the lease "as if [Kenneth] had originally been named as Lessor in the Lease," ostensibly, Kenneth should receive all

31

of the benefits and entitlements due to the Gipses as lessors under the lease as provided in the lease's other various provisions.[6] But that result is obviously unsound. As an NPRI owner, Kenneth has no executive rights and is, therefore, due none of the entitlements owed to the lessor under the lease. *See Plainsman Trading Co.*, 898 S.W.2d at 789. Likewise, as a non-executive, Kenneth is not entitled to a landowner's royalty. *Id.* Conoco has not fully addressed the practical consequences of its argument.

In sum, the relevant case law specific to NPRI ratification guides our conclusion that the effect of Kenneth's ratification of the Conoco/Gips Lease was only to bind him to the lease's pooling provision—the only reason Conoco and the Gipses would require Kenneth's ratification of their lease. *See Montgomery*, 424 S.W.2d at 211–12; *Verble*, 680 S.W.2d at 70. We do not hold that an NPRI holder may never diminish its rights by ratifying an oil and gas lease with provisions explicitly purporting to do so. Leases with such provisions may arise, and any potential appeal in such a case would present an opportunity to address that issue. But the Conoco/Gips Lease contains no such provision.

Consequently, Kenneth is due his fixed one-eighth royalties from production on Tract A from June 9, 2002, through June 8, 2017. Because Tract A was pooled into

---

[6] For example, the lessor under Conoco and the Gipses' lease is entitled to, among other things: (1) receive $1.50 per foot for a pipeline right of way for installing infrastructure; (2) receive notice from Conoco of any suspected environmental contamination or pollution; (3) keep all of Conoco's equipment should it fail to remove its property within six months after the expiration of the lease; (4) require Conoco to bury all pipe lines; (5) receive compensation for loss or damage to crops, trees, livestock, among other things; (6) require Conoco to construct livestock fencing and to clean up trash; (7) receive $1,000 as liquidated damages for any oak tree damaged by Conoco; (8) receive $25 per day as liquidated damages should Conoco fail to furnish a release from the oil and gas lease within sixty days of the lease's expiration; and (9) receive a minimum of $60 per leased mineral acre.

Maurer Unit B, Kenneth's royalty interest in and to production from Maurer Unit B is 0.01507352 from first production through June 8, 2017—amounting to Kenneth's one-eighth NPRI diminished only by Tract A's 0.12058814 pooling participation rate.

We sustain Kenneth's first issue.

## VI.    ATTORNEY'S FEES

By his second issue, Kenneth argues that "the trial court err[ed] in awarding attorney's fees to Conoco[] under the [UDJA]." We agree.

### A.    Applicable Law

The UDJA provides that:

> A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.

TEX. CIV. PRAC. & REM. CODE ANN. § 37.004(a). Section 37.002 states that the UDJA is intended to be remedial and "its purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations; and it is to be liberally construed and administered." *Id.* § 37.002(b). A trial court may award costs and reasonable attorney's fees in a declaratory judgment action when doing so is equitable and just. *Id.* § 37.009. Because the UDJA does not require an award of attorney's fees, on appeal, we review the trial court's judgment awarding fees for an abuse of discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998). A trial court abuses its discretion "when it acts arbitrarily, unreasonably, or without reference to legal principles." *Berkel & Co. Contractors, Inc. v. Lee*, 612 S.W.3d 280, 287 (Tex.

2020).

Declaratory relief is unavailable to settle a dispute that is currently pending before a court. *BHP Petroleum Co., v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990) (orig. proceeding); *Tex. Liquor Control Bd. v. Canyon Creek Land Corp.*, 456 S.W.2d 891, 895 (Tex. 1970) ("[A]n action for declaratory judgment will not be entertained if there is pending, at the time it is filed, another action or proceeding between the same parties and in which may be adjudicated the issues involved in the declaratory action."). However, a court may allow a declaratory judgment counterclaim when it "has greater ramifications than the original suit." *Winslow v. Acker*, 781 S.W.2d 322, 328 (Tex. App.—San Antonio 1989, writ denied); *see HECI Expl. Co. v. Clajon Gas Co.*, 843 S.W.2d 622, 638 (Tex. App.—Austin 1992, writ denied) ("A party bringing a counterclaim may recover attorney's fees under the [UDJA] if its counterclaim is more than a mere denial of the plaintiff's cause of action."). "To have 'greater ramifications' than the original suit, the counterclaim should seek some sort of affirmative relief." *HECI Expl. Co.*, 843 S.W.2d at 638–39. "To qualify as a claim for affirmative relief, a defensive pleading must allege that the defendant has a cause of action, independent of the plaintiff's claim, on which he could recover benefits, compensation or relief, even though the plaintiff may abandon his cause of action or fail to establish it." *Gen. Land Off. of State of Tex. v. OXY U.S.A., Inc.*, 789 S.W.2d 569, 570 (Tex. 1990) (quoting *Weaver v. Jock*, 717 S.W.2d 654, 657 (Tex. App.—Waco 1986, writ ref'd n.r.e.)).

**B.    Analysis**

In this Court's 2018 decision, we held that Kenneth reserved a fixed one-eighth

34

NPRI in Tract A; i.e., Kenneth was due one-eighth of all proceeds from production from Tract A. *Hahn*, 2018 WL 771908, at *8. On remand, the parties evidently agreed that Kenneth's interest and royalty payments were to be diminished by the pooling provision within the Conoco/Gips Lease and that Tract A's tract participation rate is 0.12058814. Conoco "paid [Kenneth] for the royalties due on Tract A from the creation of the Maurer Unit B until June 15, 2017[,] using" a royalty rate that was further diminished by the landowner's royalty. Kenneth filed his Fourth Amended Petition, in which he asserted claims for statutory underpayment "of his rightful share of proceeds from the sale of oil and gas allocable to Tract A and Tract B." In response, Conoco filed its answer, affirmative defenses, and declaratory judgment counterclaim noting that "[t]here is a live dispute and controversy between the parties regarding the proper calculation of the royalty decimal to be used to calculate [Kenneth]'s royalty share on his reserved interest." Conoco requested that the trial court declare Kenneth's royalty decimal rate to be 0.00376838 given Kenneth's ratification of its oil and gas lease with the Gipses. In other words, in response to Kenneth's argument that he was being underpaid for his share of royalties, Conoco raised Kenneth's ratification to argue that Kenneth was not being underpaid for his share of royalties. While such an argument would have been properly raised as an affirmative defense, it was not properly brought as a UDJA counterclaim. *See Samson Expl., LLC*, 521 S.W.3d at 781, 783 (ratification is an affirmative defense); *Land Title Co. of Dall.*, 609 S.W.2d at 756 ("Ratification is . . . an affirmative defense."); *BHP Petroleum Co.*, 800 S.W.2d at 841 (declaratory relief not available to settle a pending dispute). The dispute over Kenneth's mineral royalty

35

calculation already before the trial court, Conoco's declaratory judgment action was improper, having no ramifications beyond resolution of that very issue. *See BHP Petroleum Co.*, 800 S.W.2d at 841; *Gen. Land Off. of State of Tex.*, 789 S.W.2d at 570; *HECI Expl. Co.*, 843 S.W.2d at 638–39. The trial court thus erred by awarding attorney's fees to Conoco under the UDJA. Accordingly, we sustain Kenneth's second issue and reverse the trial court's award of attorney's fees to Conoco.

Kenneth sought attorney's fees and costs associated with his "seeking to enforce his rights against [Conoco] pursuant to" § 38.001 of the Texas Civil Practice & Remedies Code and § 91.406 of the Texas Natural Resources Code. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001; TEX. NAT. RES. CODE ANN. § 91.406. In light of our conclusions above, we remand for a proper determination of attorney's fees owed to Kenneth, if any.

## VII.   CONCLUSION

We (1) reverse the trial court's judgment granting Conoco's motion for summary judgment, denying Kenneth's motion for summary judgment, and awarding attorney's fees to Conoco, (2) render judgment that Kenneth maintained a fixed one-eighth NPRI in Tract A and a royalty decimal interest of 0.01507352 in and to production from Maurer Unit B from first production through June 8, 2017, and (3) remand for further proceedings consistent with this memorandum opinion.

DORI CONTRERAS
Chief Justice

Delivered and filed on the
1st day of December, 2022.